UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NOAH SMALL,

                        Petitioner,

                                                **OPINION & ORDER**
                                                **CV-07-1117**

         -against-

ARTUS, Supt.,

                        Respondent.
-------------------------------------------------------X
FEUERSTEIN, J.

         On January 14, 2002, a judgment of conviction was entered against petitioner Noah Small

("petitioner") in the Supreme Court of the State of New York, Kings County (Ruchelsman, J.),

upon a jury verdict and imposition of sentence. The jury found petitioner guilty of two (2) counts

of criminal possession of a weapon in the second degree and one (1) count each of criminal

possession of a weapon in the fourth degree, criminal possession of a controlled substance in the

third degree, criminal possession of stolen property in the fifth degree, criminally using drug

paraphernalia in the second degree, criminal possession of marijuana in the fourth degree, and

possession of ammunition. Petitioner was sentenced, as a second violent felony offender, to

concurrent determinate terms of imprisonment of fifteen (15) years for each conviction of

criminal possession of a weapon in the second degree and an indeterminate term of imprisonment

of ten (10) to twenty (20) years for the conviction of criminal possession of a controlled

substance in the third degree, to run consecutively to the sentence imposed for the two (2)

weapon possession convictions; and one (1) year for each of the remaining convictions, to run

concurrently with each other and with the other sentences.

On March 12, 2007, petitioner filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. By order dated July 14, 2008, petitioner was granted leave to amend his petition to incorporate the issues he raised in a motion filed in state court pursuant to N.Y. C.P.L. § 440.10, and those issues were deemed incorporated into his habeas corpus petition.

For the reasons set forth herein, the petition, as amended, is denied and the proceeding is dismissed.

## I.     BACKGROUND

The following facts and allegations were taken from the petition ("Pet."), trial transcript (T.) and sentencing minutes (S.):

### A.     Factual Background

#### 1.     The People's Case

On September 21, 2000, Police Officer Jack Herzlinger ("Herzlinger") applied to the Supreme Court of the State of New York, Kings County (Lott, J.) ("the warrant court") for a warrant authorizing a "no-knock" entry into the premises of 233 Sand Street, Apartment 11G ("the subject apartment"), in Brooklyn, New York. (Herzlinger: T. 379 – 80; Pet. "Addendum Two".) Based upon Herzlinger's testimony, *inter alia*, that he had previously investigated the subject apartment, and the corroborating sworn testimony of a confidential informant, the warrant court issued a search warrant for the seizure of guns, ammunition, and records relating to illegal gun trafficking. (T. 379, 435, 481; Pet. "Addendum Two".)

On September 22, 2000, at approximately 5:00 a.m., a pre-execution tactical meeting ("the 'Tac' meeting") was held at the 84th Precinct, which was attended by all officers participating in the execution of the search warrant, including Herzlinger, (T. 381), Police Officer Mario Zorovic ("Zorovic"), (T. 327 - 8, 359), Police Officer William Valenti ("W. Valenti"), (T. 514), Lieutenant Raymond Dewitt ("Dewitt"), (T. 583 – 4), and Sergeant Jeffrey Schneider ("Schneider"), (T. 623 - 5). (Herzlinger: T. 381; Schneider: T. 623). The purpose of the "Tac" meeting was to share information regarding the location of the premises to be searched and what might be encountered inside, to formulate a plan as to how to make entry safely and to assign specific tasks to each officer. (Herzlinger: T. 381 – 2; Zorovic: T. 327 – 8; Dewitt: T. 584.)

Herzlinger was assigned to be the arresting officer and recording officer. (Herzlinger: T. 382 – 3; Schneider: T. 646; Dewitt: T. 586.) His duties included taking custody of all subjects detained by the members of the Emergency Services Unit ("ESU"), processing the arrests, conducting the search of the subject apartment and cataloging any and all items recovered. (Herzlinger: T. 382 – 3; Schneider: T. 646; Dewitt: T. 586.)

Zorovic testified that, as a member of the ESU, he was assigned to one (1) of two (2) "bunker teams," whose duties included entering the subject apartment, securing the premises and clearing each room of potential danger prior to its search. (T. 329, 346 – 7, 363.)

W. Valenti, as a member of the Investigative Unit ("IU"), was initially assigned to the tenth (10th) floor of 233 Sands Street ("the subject premises"), but his position was changed to rear security prior to the arrival of the ESU members at the "Tac" meeting. (W. Valenti: T. 514, 560, 578; Herzlinger: T. 402; Schneider: T. 624 – 5, 647.) W. Valenti testified that his duties on rear security included securing the surrounding premises, removing any pre-existing contraband

from the subject premises prior to execution of the search warrant, watching all means of entry or exit to the subject apartment to ensure that nothing and no one exited the location and surveying the windows of the subject apartment to ensure that nothing was thrown out of them and nobody jumped out of them. (T. 514 – 5.)

Dewitt testified that he was assigned to be the "anti-crime supervisor," whose primary responsibility was to assist Schneider in supervising the officers and to maintain custody of any prisoners or contraband recovered during the search. (T. 584 – 6.) Dewitt also secured the lobby and elevators of the subject premises to ensure "a smooth and seamless entry to the eleventh floor" by the ESU members. (T. 588.)

Schneider was the supervising officer, whose duties included assigning officers to specific tasks during the "Tac" meeting, ensuring the safety of any individual arrested and supervising the proper vouchering of any contraband recovered. (Dewitt: T. 587; Schneider: T. 623 – 5, 627.)

The search warrant for the subject apartment was executed on September 22, 2000, at approximately 5:30-5:45 a.m., while it was still dark outside. (Zorovic: T. 328, 356; Herzlinger: T. 384, 493 – 4, 502; W. Valenti: T. 516, 518, 523, 556; Dewitt: T. 588; Schneider: T. 626.) Schneider, Herzlinger, the ESU members and Police Officer McGorren rode the elevator to the tenth (10th) floor of the subject premises, then ascended the stairs to the eleventh (11th) floor. (Herzlinger: T. 385 – 6; Schneider: T. 626.) The breach team of the ESU then attempted to breach the door to the subject apartment by prying the door using a "rabbit tool"[1] and utilizing a

_____

[1] A "rabbit tool" is a hydraulic tool that is placed between the doorjamb and door which separates the locking mechanism connecting the door to the wall, allowing for easy entrance into

sledgehammer to forcibly breach the door. (Zorovic: T. 353 – 4, 358; Herzlinger: T. 387 – 8, 416, 487.)

After the door was breached, Police Officer Riordan threw a stun device[2] into the apartment and the ESU bunker teams entered and secured the apartment. (Zorovic: T. 350, 353, 361, 373; Herzlinger: T. 389, 496; Dewitt: T. 593.) Two (2) black males were discovered in one (1) of the two (2) bedrooms in the subject apartment. (Zorovic: T. 349, 354, 370; Herzlinger: T. 391 – 2.) Herzlinger, Dewitt and Schneider identified both men detained in the subject apartment as petitioner and the co-defendant, Plato. (Herzlinger: T. 393; Dewitt: T. 594; Schneider: T. 632). According to Zorovic, neither man offered any resistance upon being detained and handcuffed. (T. 362, 370.)

Zorovic testified that after he cuffed the two (2) men and secured the premises, he allowed the IU members to enter and begin their investigation, at which time he left the premises. (T. 354 – 5, 364, 367.) Zorovic did not personally witness either of the two (2) men discovered in the apartment toss any items from the window or be in direct possession of any contraband. (T. 371, 376.)

After the subject apartment was secured and petitioner and the co-defendant arrested, Herzlinger conducted a search of the premises under the supervision of both Dewitt and Schneider, during which he recovered a stolen police radio, a white powdery substance[3], pictures,

---

an apartment. (Zorovich: T. 358; Herzlinger: T. 387 – 8.).

[2] The stun device emits a "very loud noise," an extremely bright light and smoke, disorienting anyone within its proximity. (Zorovich: T. 361 – 2; Herzlinger: T. 389.)

[3] Upon testing, the white powdery substance was discovered to be a non-controlled substance. (Herzlinger: T. 400, 442; T. 427 – 8.)

handcuffs, ammunition for various guns, a fake police shield, a samurai sword, suspected crack cocaine, photographs of petitioner, several cell phones and pagers, "small plastic baggies commonly used in packaging controlled substances," another "little ziplock of alleged crack," and a total of eight hundred and five dollars ($805.00) from the apartment: six hundred and fifty dollars ($650.00) from a jacket in the closet in the bedroom in which petitioner and the co-defendant were discovered; one hundred and thirty eight dollars ($138.00) in the pockets of petitioner's pants; and seventeen dollars ($17.00) in the pockets of the co-defendant's pants. (Herzlinger: T. 395 – 8, 400 – 1, 420 – 1, 449 – 51, 466 – 1 480 – 2, 505; Dewitt: T. 596 – 7, 602; Schneider: T. 636, 642, 651.)

Herzlinger testified that during the search he did not recover any mail belonging to petitioner in the subject apartment, (T. 491), nor did he find any key to the subject apartment in petitioner's possession. (T. 490 – 1, 509.) Dewitt testified that he noticed a college registration form bearing petitioner's name in a suitcase recovered from the bedroom, but he did not voucher the form because "[f]or [him] it was as good as the TV or the bed. It meant nothing. It was [petitioner's] personal belongings." (T. 602, 607-610, 615-6.) Herzlinger and Dewitt both testified that they did not personally observe either petitioner or the co-defendant in direct possession of, or in contact with, any of the contraband recovered during the search. (Herzlinger: T. 495 – 6; Dewitt: T. 606 – 7, 609.) Moreover, Herzlinger, Dewitt and Schneider all testified that they never ascertained who owned or leased the subject apartment prior to, or following, the execution of the search warrant. (Herzlinger: T. 490, 508; Dewitt: T. 610; Schneider: T. 649.)

W. Valenti testified that during his reconnaissance of the subject premises prior to the positioning of the ESU team on the eleventh (11th) floor, he did not observe any pre-existing

contraband. (T. 517.) According to W. Valenti, Herzlinger alerted him by radio when they were about to enter the subject apartment, at which time he observed the window of the subject apartment become illuminated, heard the window being opened, and then witnessed two (2) silhouettes alternately lean out of the window and defenestrate objects, including a large red bag. (T. 519 – 520, 524, 560 – 2, 571.) W. Valenti testified that the two (2) silhouettes continued throwing objects out of the window until they were apparently startled by the large bang caused by the deployment of the stun device. (T. 521 – 522.)

According to W. Valenti, he knew that he was watching a window from the eleventh floor because he counted the floors from the ground up and the roof down. (T. 522.) In addition, after the apartment had been secured by the ESU members, but prior to its search, Herzlinger shone his flashlight out of the same window through which W. Valenti had observed the silhouettes throw objects. (W. Valenti: T. 522, 526; Herzlinger: T. 403-5). Herzlinger testified that he shone his flashlight from the bedroom window in which petitioner and the co-defendant were located and detained. (W. Valenti: T. 522, 526; Herzlinger: T. 403 – 5.)

W. Valenti recovered from the ground outside the subject apartment the following objects which had been thrown from the window of the subject apartment: a fully loaded .45 caliber handgun, a .9 millimeter handgun loaded with one (1) .38 caliber round, a loaded .22 caliber long pistol, magazines and ammunition for the guns, a large amount of small plastic Ziploc bags containing either crack cocaine or marijuana, a police radio and five hundred and fifty (550)

rounds for the .22 caliber pistol, which were in the large red bag. (W. Valenti: T. 526 – 45, 564 – 5, 570; Dewitt: T. 598.)[4]

Betsie Bruno ("Bruno"), a chemist, testified as an "expert in the field of chemical analysis of controlled substances." (T. 656.) Bruno testified that, upon testing all materials recovered from the subject apartment and premises, she determined that the green leafy substance was marijuana, (T. 658 – 9), that the white powdery substance recovered from within and on top of the refrigerator was not a controlled substance, (T. 664 – 5), but that the other powders recovered from the subject apartment and premises were cocaine, (T. 667 – 8).

Harvey Casper ("Casper")[5], an assistant district attorney, testified that, based upon calculations of the street value of the drugs at the time of the execution of the search warrant, the police recovered approximately two thousand six hundred dollars ($2600.00) worth of crack cocaine and three hundred and fifty dollars ($350.00) to four hundred dollars ($400.00) worth of marijuana. (T. 698 – 703.) Casper further testified that the large quantity of Ziploc bags, coupled with the white powdery non-controlled substance, both found in the subject apartment,

---

[4] A bullet proof vest was also recovered, but there is a discrepancy as to whether it was recovered from inside the apartment or the ground outside the apartment. (T. 462 – 3, 506)

[5] During *voir dire*, Casper testified as to his employment in the Kings County District Attorney's office and his qualifications as an expert: 1) "from January 1977 to [present] day [he had] been assigned as a narcotics prosecutor," 2) "[a]t some point in 1982 [he] was named the deputy chief of the narcotics bureau," 3) he was "in charge of what's called narcotics trial operations," 4) "from 1975 through the present [he had] been involved in lecturing city, state and federal government [sic] in narcotics prosecution," and 5) he "train[s] police officers in the area of narcotics. . . ." (T. 685 – 7.) Furthermore, Casper testified that he kept "records of the values [of narcotics] both at wholesale as well as street level . . . in order to effectively train district attorneys to handle narcotics cases [and] law enforcement members. . . ." (T. 688). The court qualified Casper as "an expert in the area of narcotics, values, packaging, as well as methodology and distribution of narcotics." (T. 695.)

were consistent with an intent to sell drugs. (T. 708 – 10.) In response to the following hypothetical: "[I]f . . . [the white powdery non-controlled] substance was recovered inside of an apartment that was barely lived in . . . and . . . within this apartment . . . crack cocaine was recovered . . . what would your conclusion then be . . . [as to] what that substance would be?", Casper testified that he would believe that the white powdery substance was being used to dilute the narcotics, although he could not be one hundred percent (100%) certain. (T. 710.) Furthermore, Casper testified: (1) that the recovery of police scanners, a police radio, cell phones and pagers would lead him to believe that the residents of that "hypothetical" apartment were "involved in narcotics distribution from inside locations," (T. 712 – 3.); and (2) that "[t]hings like ammunition and guns or bullet proof vests, again those are things that are often found in the apartments of individuals that are involved in the packaging and sale of illegal substances for protection." (T. 712.) Finally, Casper testified that the items recovered from the "hypothetical" apartment were "consistent with a drug seller, not a drug user." (T. 713.)

On cross examination, Casper testified that since he has been a prosecutor for twenty seven (27) years, he was the "prototype interested witness" from defense counsel's perspective. (T. 717, 724.)

Detective Bruno R. Valenti ("B. Valenti") was qualified, upon stipulation of all counsel, as an "expert in the field of firearms identification and examiner." (T. 742.) B. Valenti testified that all weapons recovered from the search of the subject apartment were operable, (T. 748 – 61), and that all ammunition recovered from the subject apartment appeared live and ready for firing, (T. 762 – 7). B. Valenti also testified that although he could ascertain that the guns had been

previously discharged, he could not ascertain when such prior discharge had occurred. (T. 752, 758, 761, 767 – 8.)

2. Petitioner's Defense

Ebony Davis ("Davis") testified on behalf of petitioner. (T. 773 – 4.) Davis testified that in September 2000, she was dating petitioner and shared an apartment with him, located at 190 York Street, Apartment 6-C, in the same complex as the subject apartment, for seven (7) months. (T. 777, 781 – 2). Davis further testified that she had evicted petitioner from their shared apartment at approximately 6:00 p.m. on September 21, 2000, the night before the execution of the search warrant, following an argument. (T. 776 – 8, 782.) According to Davis, the co-defendant aided petitioner in removing his belongings from her apartment until approximately midnight on the night of September 21, 2000, but she was unaware of where petitioner and the co-defendant went after they left. (T. 778, 785 – 7, 791 – 2.)

3. Expert Witness Charge and Supplemental Charge on Intent

The court charged the jury with respect to determining the credibility and reliability of witnesses in general, including expert and interested witnesses. (T. 900 – 1.) The court then charged the jury specifically with respect to expert witnesses as follows:

"You will recall that the witness Betsy Bruno gave testimony concerning her qualifications as an expert in the field of criminal analysis of controlled substances. Harvey Casper gave testimony concerning his qualifications as an expert in the field of value packaging and distribution of drugs. And Detective Bruno Valenti gave testimony concerning his qualifications as an expert in the field of firearms analysis. Where scientific, technical or other specialized

10

knowledge will assist the jury to understand the evidence or to determine a fact in issue, our law permits a witness qualified as an expert by knowledge, skill, experience, training, or education to state his opinion on questions in controversy in the trial for the information of the Court and jury . . . [T]he opinions stated by each expert who testified before you were based on particular facts as the expert themselves observed them, or as the attorney who questioned them asked such expert to assume . . . [Y]ou may consider the opinion of any expert together with the reasons given for such opinion by them. You may also consider the qualifications and credibility of such expert.

You may reject an expert's opinion if you find the facts to be different from those which served as the basis for his opinion. You may also reject an expert's opinion if after careful consideration of all the evidence in the case, expert and otherwise, you disagree with the expert's opinion. In other words, you and you alone are to form your own opinion or draw your own conclusion as to any question or controversy in this case. In summary, the opinions of expert witnesses are subject to the same rules and tests concerning reliability as the testimony of any other witness."

(T. 901 – 2).

The court also instructed the jury regarding the "material principles that apply to the crimes with which the [petitioner was] charged." (T. 906.) The court instructed the jury regarding the definition of "possession" that was "applicable to all charges dealing with possession" as follows:

"Now, to possess means to have physical possession or otherwise to exercise dominion or control over tangible property. Thus, a person may possess property in either of two ways. First, the person may have physical possession of it by holding it in his hand or carrying it in or on his body or person. Second, the person may exercise dominion or control over property not in his physical possession. A person who exercises dominion or control over property not in his physical possession is said to have that property in his constructive possession. Under our law a person has tangible property in his constructive possession when that person exercises a level of control over the area in which the property is found, or over the person from whom the property is seized sufficient to give the ability to use or dispose of the property. Additionally, the law recognizes the possibility that two or more individuals can jointly have property in their constructive possession. Two or more persons have property in their joint constructive possession when they each exercise dominion or control over the

property by a sufficient level of control over the area in which the property is found, or over the person from whom the property is seized to give each of them the ability to use or dispose of the property."

(T. 908 – 9.)

The court then thrice charged the jury regarding the elements of criminal possession of a weapon in the second degree (counts one, three and five) as follows:

"Under our law a person is guilty of criminal possession of a weapon in the second degree when that person knowingly possesses a loaded firearm with the intent to use the same unlawfully against another."

(T. 909, 912, 915).

The court defined the meaning of the terms "firearm," "loaded firearm," "possess," "knowingly" and "intent." With respect to "intent," the court thrice charged the jury as follows:

"Intent means conscious objective or purpose. Thus, a person acts with intent to use a loaded firearm unlawfully against another when his conscious objective or purpose is to use that loaded firearm unlawfully against another."

(T. 909, 912, 915.)

During deliberations, the jury sent a note to the court asking whether the "intent to use" element of the weapon charges were "tied to any date, September 22, 2001, or [included] future uses." The court then gave the following supplemental charge regarding the "intent to use" element of criminal possession of a weapon in the second degree:

"The intent to use the weapon must have been – the intent to use element of the criminal possession with intent to use must have been formed on the date of [sic] question, let's say September 22d, but the actual – but the actual using of the gun could be later.

Let me give you an example. Let's say today is September 22d, Tuesday, and somebody has a gun. He must have had the intent on September 22d to use the gun. But it doesn't mean he has to use it today, Tuesday. He could use it on Friday. He could use it on Monday, next week or the following week. The intent

12

to use has to be, I have the gun today, I intend to use it. But I'm not going to use it today. I may use it Friday. I may use it next Monday. I may use it next Wednesday. I may use it next Friday. It doesn't have to be he intends to use it on the day that he has the gun. . . .

Let's say Mr. A is found with a gun, okay. In order to convict Mr. A, Mr. A must have intended to use the gun. But if he's found with the gun today, today is Tuesday, he must have the gun on him and he must have intended to use it not necessarily today, Tuesday, but at some future date Mr. A is going to use that gun, whether it's Thursday, whether it's Friday, whether it's Monday. So he has to have an intent to use the gun when you find him with the gun but it doesn't mean he has to use it today, Tuesday.

In our case, the defendants are charged with criminal possession of a weapon with intent to use. That intent to use must have come about on September 22nd, the day in question. However, it doesn't mean they were going to use that gun on September 23d, September 24th, September 30th or whenever. It doesn't have to be the same date that they get caught with the gun that they intended to use it on that day. Okay?"

(T. 949 – 51.)


### 4.    Verdict and Sentence

The jury found petitioner not guilty of criminal possession of a weapon (the .9 millimeter pistol) in the second degree. (T. 952). The jury found petitioner guilty of criminal possession of a weapon in the fourth degree (the .9 millimeter pistol); two (2) counts of criminal possession of a weapon in the second degree (the .22 caliber pistol and the .45 caliber pistol); criminal possession of a controlled substance (cocaine) in the third degree; criminal possession of stolen property in the fifth degree; criminally using drug paraphernalia in the second degree; criminal possession of marijuana in the fourth degree; and unlawful possession of ammunition. (T. 952 – 953.)

On January 14, 2002, petitioner was sentenced, as a second violent felony offender, (S. 6), to: (a) concurrent determinate terms of imprisonment of fifteen (15) years for each of his convictions of criminal possession of a weapon in the second degree; (b) an indeterminate term of imprisonment of ten (10) to twenty (20) years for the conviction of criminal possession of a controlled substance in the third degree, to run consecutively with the sentences imposed on the weapon possession convictions; and (c) determinate terms of imprisonment of one (1) year for each of the remaining offenses, i.e., possession of stolen property in the fifth degree, criminal use of drug paraphernalia in the second degree, criminal possession of marijuana in the fourth degree, unlawful possession of ammunition, and criminal possession of a weapon in the fourth degree, all to run concurrently with each other and with the other sentences.  (S. 20 – 1.)

B.      Procedural History

Petitioner, through counsel, appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds, *inter alia*: 1) that the trial court erred in permitting Casper to testify as an expert witness; 2) that the search warrant was not validly issued and violated his right against unreasonable searches and seizures; and 3) that the sentence imposed was excessive.  Petitioner also filed a *pro se* supplemental brief claiming: 1) that the search warrant was invalid and that the trial court erroneously denied his motion to suppress without a hearing; 2) that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; 3) that his sentence should have been imposed to run concurrently; 4) that the court's jury charge on intent relating to the weapon possession charges was misleading

14

and prejudicial and deprived him of due process; and 5) that he was denied effective assistance of trial counsel.

On October 3, 2005, the Appellate Division, Second Department affirmed the judgment of conviction, finding, *inter alia*: 1) that the trial court properly denied petitioner's motion to suppress without a hearing because "the confidential informant, while under oath, directly provided information to the issuing court supporting probable cause for the issuance of the search warrant," and therefore, the <u>Aguilar-Spinelli</u> test, <u>see</u> <u>Aguilar v. State of Texas</u>, 378 U.S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964); <u>Spinelli v. United States</u>, 393 U.S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969), was inapplicable; 2) that the evidence was legally sufficient and the verdict was not against the weight of the evidence; 3) that "[t]he concurrent sentences imposed on the two weapons convictions were properly made to run consecutively to the term of imprisonment imposed on the conviction of criminal possession of a controlled substance in the third degree," and the sentence imposed "was not otherwise excessive;" and 4) that petitioner's remaining contentions were either unpreserved or without merit. <u>People v. Small</u>, 22 A.D.3d, 509, 804 N.Y.S.2d 89 (2d Dept. 2005). On December 14, 2005, the Court of Appeals denied leave to appeal the order of the Appellate Division. <u>People v. Small</u>, 6 N.Y.3d 758, 810 N.Y.S.2d 426, 843 N.E.2d 1166 (N.Y. 2005).

On March 15, 2007, petitioner, *pro se*, filed this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, alleging: 1) that his Fifth and Fourteenth Amendment rights were violated when the trial court permitted Casper to testify as an expert witness; 2) that the search warrant was not validly issued and violated his Fourth Amendment right to be free from unreasonable searches and seizures; 3) that the search warrant was invalid and the trial court's

denial of a hearing on his motion to suppress the evidence discovered pursuant to the invalid search warrant violated his Fifth and Fourteenth Amendment rights; 4) that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; 5) that the trial court's jury charge on intent relating to the weapon possession charges was misleading and prejudicial and deprived him of due process; 6) that his trial counsel was ineffective for failing to request a hearing on his motion to suppress; and 7) that the sentences imposed "should be made to run concurrent." (Pet. 3, 11). Respondent filed the return on July 5, 2007.

Thereafter, petitioner moved in state court pursuant to section 440.10 of the New York Criminal Law Procedure ("the 440.10 motion") to vacate the judgment of conviction on the ground that his counsel rendered ineffective assistance at trial[6] and to set aside his sentence on the ground that his weapon possession and drug possession convictions should have run concurrently because the prosecution made "the drugs a material element in convicting [petitioner] of Criminal Possession of a Weapon in the Second Degree." (Pet. Am. Br. 7). By order dated June 17 2008, this Court denied petitioner's application, *inter alia*, to hold his habeas proceeding in abeyance pending exhaustion of the claims raised in his 440.10 motion, without prejudice to renewal in the event petitioner exhausted those claims while his petition was *sub*

---

[6] Petitioner's motion pursuant to N.Y. C.P.L. § 440.10 alleged that his trial counsel was ineffective for failing to: 1) "request. . . a Bill of Particulars,"; 2) "move to disclose the un-redacted search warrant application,"; 3) "review open file discovery before trial,"; 4) "specify items to be suppressed that were not listed on search warrant to be seized,"; 5) "have an eye specialist examine the accuracy of Officer Valenti's eyesight,"; 6) "put into evidence the pre-execution tactical plan report,"; 7) "object to the erroneous jury charge,"; 8) "request proper jury charges,"; and 9) "submit a trial order of dismissal motion,". (Pet. Am. Br. 1 – 6.)

*judice.* By letter dated June 23, 2008, petitioner advised this Court that the claims raised in his 440.10 motion had been fully exhausted, and, in effect, sought leave to incorporate those claims into his petition for a writ of habeas corpus. By order dated July 14, 2008, petitioner's motion to amend was granted and his petition was deemed amended to incorporate the claims raised in his 440.10 motion.

II.     DISCUSSION

A.     Pro Se Status

A *pro se* petitioner's submissions are held "to less stringent standards than formal pleadings drafted by lawyers...." Hughes v. Rowe, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.E.2d 163 (1980) (quoting Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.E.2d 652 (1972)). Thus, a court must "read the pleadings of a *pro se* plaintiff liberally and interpret them to raise the strongest arguments they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotations and citations omitted). Nonetheless, a *pro se* petitioner is not exempt from compliance with relevant rules of procedural substantive law. Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983).

B.     The AEDPA

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief.

1.     Procedural Requirements of the AEDPA

17

A federal court may not review a state prisoner's federal claims which were denied in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In order to establish the procedural default of a federal habeas claim, the state court's reliance upon state law must be "clear from the face of the opinion." Fama v. Commissioner of Correctional Services, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotations and citation omitted). If a state court holding contains a plain statement that a claim is denied based upon a procedural default, then the federal habeas court may not review that claim, even if the state court also rejected the claim on the merits in the alternative. See, Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision); see also Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) ("[W]hen a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted.").

Although the issues raised in the original petition satisfy the procedural prerequisites of the AEDPA[7], the additional claims raised by petitioner in his 440.10 motion and incorporated in the amended petition, though exhausted, were all denied by the state court pursuant to an independent and adequate state procedural rule and, thus, are subject to the procedural default

---

[7] It is undisputed that petitioner has exhausted all of the claims raised in his petition, as amended, as required by the AEDPA.

rule. The state court denied the branch of petitioner's 440.10 motion alleging ineffective assistance of trial counsel on the basis, *inter alia*, that those claims should have been raised on direct appeal. See N.Y.C.P.L § 440.10(2)(c) ("[T]he court must deny a motion . . . when . . [a]lthough sufficient facts appear on the record of the proceedings . . . to have permitted . . . adequate review of the . . . issue raised upon the motion, no such appellate review . . . occurred owing to the defendant's unjustifiable failure to . . . raise such . . . issue upon an appeal actually perfected by him."). Since petitioner could have raised the ineffective assistance of trial counsel claims included in his 440.10 motion on his direct appeal of the judgment of conviction, but failed to do so, those claims were denied pursuant to an independent and adequate state procedural rule, thus establishing a procedural default.

In addition, the branch of petitioner's 440.10 motion seeking to set aside his sentence was denied by the state court on the ground that that claim had been decided on the merits on direct appeal from the judgment of conviction. See N.Y.C.P.L. § 440.10(2)(a) (prohibiting any collateral attack upon an issue that was "determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue. . . .") Since petitioner's claim concerning his consecutive sentences was determined on the merits on direct appeal and there was no retroactively effective change in the law concerning its adjudication, this claim is also subject to the procedural default rule.

Since petitioner has not demonstrated cause for his procedural defaults, actual prejudice, or that a failure to consider these claims will result in a fundamental miscarriage of justice, all of

the claims raised in petitioner's 440.10 motion and incorporated into his amended habeas petition are dismissed.

## 2.  Standard of Review

Under the AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits"[8] in state court only if the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause [of 28 U.S.C. § 2254(d)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); see also, 28 U.S.C. § 2254(d)(1). "Under the 'unreasonable application' clause [of 28 U.S.C. § 2254(d)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Williams, 529 U.S. at

_____

[8] "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)); see also Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006).

413, 120 S.Ct. 1495; see also, 28 U.S.C. § 2254 (d)(1). A federal court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S.Ct. 1495; see also, Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001).

A state court's determination of the factual issues "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### C.     Claims Determined on the Merits

#### 1.     Admissibility of Evidence Claim

Petitioner alleges that the trial court erred in permitting Casper to testify as an expert witness regarding drug operations because he was an assistant district attorney with a vested interest in the outcome of his criminal proceeding and "whether or not he'[d] tried five thousand narcotics cases [did not] qualif[y] him as an expert in this particular case." (T. 679.) Petitioner also claims that the particular testimony Casper offered concerning the street value of the narcotics recovered unduly prejudiced his trial.

Federal habeas review is limited to determining whether a petitioner's custody violates federal law, see 28 U.S.C. § 2254(a), and does not lie for mere errors of state law. Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). As such, challenges to the admissibility of evidence are cognizable on habeas review only if the petitioner can establish that the decision to admit the evidence rendered the trial so fundamentally unfair as to deny him or

21

her due process of law. See Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998). "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" Id. (citing Dowling v. United States, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.'" Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985) (quoting Nettles v. Wainwright, 677 F.2d 410, 414-15 (5th Cir. 1982)).

Casper testified as to the valuation of the contraband recovered from the subject apartment and his opinions regarding: 1) the hypothetical use of the paraphernalia recovered from the subject apartment in drug operations; and 2) whether a person discovered in possession of such an amount of contraband intended to use them for personal use or for distribution. Since the subject matter of Casper's testimony was beyond the knowledge of the average juror, his testimony was admissible. See, e.g., U.S. v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991) ("the operations of narcotics dealers are a proper subject for expert testimony [but only when] the use of such testimony [is solely used] on occasions where the subject matter of such testimony is beyond the ken of the average juror.") (citation omitted); Doleo v. Reynolds, No. 00 Civ. 7927, 2002 WL 922260 at * 3 (S.D.N.Y. May 7, 2002) (holding that the "function of the paraphernalia found in the apartment where petitioner was arrested and the function of a drug packaging and distribution operation" are "information that is generally helpful to a jury" and therefore are "the

22

proper subject of expert testimony.") Casper's testimony was not used to bolster the accounts of the officers regarding the contraband recovered or whether petitioner and his co-defendant were in possession of such contraband; but rather was admitted solely to explain the possible use of such contraband in connection with a hypothetical drug enterprise. See Headley v. Tilghman, 53 F.3d 472, 476 (2d Cir. 1995) (holding that expert testimony is admissible even if it strengthens the story of a factual witness regarding possession, so long as it is not directly needed to demonstrate the possession of the incriminating items).

Moreover, Casper acknowledged his affiliation with the District Attorney's office and the judge instructed the jury regarding the weight to be accorded expert testimony, and how to assess the credibility of witnesses, including experts and interested witnesses. Therefore, the admission of Casper's testimony did not render the trial so fundamentally unfair as to deprive petitioner of due process. Accordingly, the Appellate Division's determination that petitioner's claim challenging the admission of Casper's testimony at trial was without merit was not contrary to, nor an unreasonable application of, federal law. As such, habeas relief is not warranted on this claim.

### 2. Fourth Amendment Claim

Prior to trial, petitioner's counsel moved to suppress all evidence obtained from the search warrant on the ground that the probable cause necessary to issue a search warrant had not been established because the trustworthiness of the confidential informant had not been verified. (Pet. 14.) The suppression court denied petitioner's motion without a hearing.

In Stone v. Powell, 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1076 (1976), the Supreme Court held that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Under Stone, Fourth Amendment violations are generally not cognizable in federal habeas, *unless* the state has failed to provide the habeas petitioner "an opportunity for full and fair litigation of a Fourth Amendment claim." Wallace v. Kato, 549 U.S. 384, 127 S.Ct. 1091, 1099, 166 L.Ed.2d 973 (2007). Stone applies to all Fourth Amendment claims regardless of the nature of the evidence sought to be suppressed. Cardwell v. Taylor, 461 U.S. 571, 103 S.Ct. 2015, 76 L.Ed.2d 333 (1983).

There are two situations in which a defendant is not provided a full and fair opportunity to litigate his or her Fourth Amendment claims, and, thus, can maintain a Fourth Amendment claim on habeas review: "(a) if the state has provided no corrective procedures at all to redress the alleged [F]ourth [A]mendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992). This Circuit has found that New York law permitting a criminal defendant to file a pretrial motion to suppress evidence unlawfully seized provides a sufficient corrective procedure to redress potential violations of a petitioner's Fourth Amendment rights. Id. at 70 n.1 ("Indeed, the federal courts have approved New York's procedure for litigating Fourth Amendment claims embodied in N.Y.C.P.L. § 710.20 et seq., as being facially adequate.") In fact, petitioner took

advantage of this opportunity to litigate any Fourth Amendment issues when he challenged the search warrant on a motion to suppress.

Nor has petitioner shown a breakdown in the underlying process with respect to his two (2) claims that the search warrant was invalidly issued and the trial court improperly denied him a hearing on his motion to suppress the evidence obtained from the warrant. The second prong of the Stone inquiry requires that a petitioner establish that the state court "failed to conduct a reasoned method of inquiry into relevant questions of fact and law," in order to find that "an unconscionable breakdown in the underlying process," has occurred. Capellan, 975 F.2d at 70 – 1 (internal quotations and citation omitted). A breakdown in a state corrective procedure usually consists of some sort of "disruption or obstruction of a state proceeding." Id. A petitioner is not entitled to habeas relief even if this court were to disagree with the state court's decision to deny his request for a hearing; the focus of habeas relief must be on the process, and not its outcome.

Petitioner has not established that the suppression court failed to conduct a reasoned method of inquiry into relevant questions of fact and law in deciding his motion to suppress. The suppression court entertained briefs concerning the suppression hearing and denied petitioner's request for a hearing only after considering the factual and legal claims asserted by the parties, including the finding of probable cause made by the warrant court upon examination of Herzlinger and the confidential informant under oath. The fact that the suppression court, in its discretion, chose not to hold a hearing does not negate the fact it undertook a serious inquiry into the merits of petitioner's suppression motion. "Mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72.

25

Since petitioner has failed to show either a lack of a corrective procedure to address potential violations of his Fourth Amendment rights, or an unconscionable breakdown in the underlying process, <u>Stone</u> precludes consideration of petitioner's claims regarding the search warrant from federal habeas review. Accordingly, those claims are dismissed.

3.    Legal Sufficiency Claim

When considering the legal sufficiency of the evidence, the court "must look to state law to determine the elements of the crime," <u>Ponnapula v. Spitzer</u>, 297 F.3d 172, 179 (2d Cir. 2002) (citation omitted), and determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction.  <u>Ponnapula</u>, 297 F.3d at 179.

Under New York law, a person is guilty of criminal possession of a weapon in the second degree when "with intent to use the same unlawfully against another, such person * * * possesses a loaded firearm. . . ." N.Y. Penal Law § 265.03(1)(b).  New York law also states that a person is guilty of criminal possession of a weapon in the fourth degree when "[h]e or she possesses any firearm. . . ." N.Y. Penal Law § 265.01(1).

Further, under New York law a person is guilty of criminal possession of a controlled substance in the third degree when "he knowingly and unlawfully possesses * * * a narcotic drug with intent to sell it. . . ." N.Y. Penal Law §220.16(1).  A person is guilty of criminal possession of stolen property in the fifth degree when "he knowingly possesses stolen property, with intent

26

to benefit himself * * * or to impede recovery by an owner thereof." N.Y. Penal Law § 165.40.

A person is guilty of criminally using drug paraphernalia in the second degree when

> "he knowingly possesses or sells: 1. Diluents, dilutants, or adulterants * * * under circumstances evincing an intent to use, or under circumstances evincing knowledge that some person intends to use, the same for unlawfully mixing, compounding, or otherwise preparing any narcotic drug or stimulant; or
> 2. Gelatine capsules, glassine envelopes, vials, capsules or any other material suitable for the packaging of individual quantities of narcotic drugs or stimulants under circumstances evincing an intent to use, or under circumstances evincing knowledge that some person intends to use, the same for the purpose of unlawfully manufacturing, packaging or dispensing of any narcotic drug or stimulant. . . ."

N. Y. Penal Law § 220.50.

A person is guilty of criminal possession of marijuana in the fourth degree when "he knowingly and unlawfully possesses * * * marihuana [sic] * * * of an aggregate weight of more than two ounces." N.Y. Penal Law § 221.15. Finally, Section 10-131(i)(3) of the Administrative Code of the City of New York provides that "[i]t shall be unlawful for any person not authorized to possess a pistol or revolver within the city of New York to possess pistol or revolver ammunition. . . ." N.Y.C. Code § 10-131(i)(3).

Viewed in the light most favorable to the prosecution, there was sufficient evidence from which a rational juror could have found petitioner guilty of all of the crimes for which he was convicted under the New York Penal Law and Administrative Code of the City of New York. At trial, police witnesses testified, *inter alia*: 1) that petitioner and his co-defendant were the only persons found in the subject apartment at the time of the execution of the search warrant; 2) that immediately prior to the execution of the warrant, two (2) figures from that same apartment were

observed opening the bedroom window and defenestrating several items from that window[9]; and 3) regarding all of the contraband recovered from the subject apartment and surrounding premises. In addition three (3) experts also testified. Bruno testified that several of the substances recovered during the search of the subject apartment and premises tested positive as narcotics and marijuana. Casper testified concerning the valuation of the narcotic substances recovered and the likely relevance of the non-narcotic powder, the hundreds of small individual Ziploc bags, the pagers, the cell phones, the police radio, and the weapons recovered from the subject apartment. In addition, Casper testified that, given all of the items recovered from the subject apartment, the circumstances dictated that the possessors of such contraband may have been involved in a drug enterprise, evidencing an intent to sell such narcotics to other users for profit and to use the weapons and the police scanner as methods of protecting the fruits of their illicit enterprise. B. Valenti testified that all of the weapons recovered were operable and had been previously fired.

Accordingly, the Appellate Division's finding that the evidence was legally sufficient to convict petitioner of criminal possession of a weapon in the second degree, criminal possession of a weapon in the fourth degree, criminal possession of a controlled substance in the third degree, criminal possession of stolen property in the fifth degree, criminally using drug paraphernalia in the second degree, criminal possession of marijuana in the fourth degree, and unlawful possession of ammunition, beyond a reasonable doubt, is not contrary to, and does not

---

[9] The fact that this was the window of the subject apartment was corroborated by another police officer.

involve an unreasonable application of, federal law. As such, habeas relief is not warranted on petitioner's legal insufficiency claim.

### 4. Weight of the Evidence Claim

Petitioner's claim that the verdict was against the weight of the evidence does not present a federal constitutional issue. See Rodriguez v. O'Keefe, No. 96 Civ. 2094, 1996 WL 428164, at * 4 (S.D.N.Y. Jul. 31, 1996), aff'd, 122 F.3d 1057 (2d Cir. 1997); see also Ramos v. Phillips, No. 05 CV 0023, 2005 WL 1541046, at * 6 (E.D.N.Y. June 30, 2005) (holding that a "weight of the evidence" claim is not cognizable in a federal habeas court); Correa v. Duncan, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001) (holding that because a "weight of the evidence" claim is a pure state law claim, a federal court is precluded by 28 U.S.C. § 2254[a] from considering the claim). Accordingly, this Court is precluded from considering petitioner's "weight of the evidence" claim.

### 5. Jury Charge

Petitioner claims that the trial court's supplemental jury charge on "intent to use" relating to the charge of criminal possession of a weapon in the second degree was erroneous and violated his due process rights.

"[A] state prisoner making a claim of improper jury instructions faces a substantial burden." DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002). "[I]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state

law but also that the error violated a right guaranteed to him by federal law." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)). "The question is whether the ailing instruction [by itself] so infected the entire trial that the resulting conviction violates due process." Middletown v. McNeil, 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004) (internal quotations and citation omitted); see also Cupp v. Naughten 414 U.S. 141, 146, 94 S. Ct. 396, 38 L.Ed.2d. 368 (1973) (holding that federal habeas relief for an erroneous jury instruction is not available when the instruction was merely "undesirable, erroneous, or even universally condemned;" it must have "violated some right which was guaranteed to the defendant by the Fourteenth Amendment.") In weighing the prejudice from an improper jury charge, the charge "'may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" Middletown, 541 U.S. at 437, 124 S.Ct. 1830 (quoting Boyde v. California, 494 U.S. 370, 378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

The trial court correctly and accurately charged the jury with respect to the elements of a charge of criminal possession of a weapon in the second degree and the definition of "intent" under New York law. When viewed as a whole, the judge's instructions did not misstate state law or "remove[] the prosecution's burden of proving the element of intent beyond a reasonable doubt,". (Pet. 21.) The court's charge clearly instructed the jury that they must find that petitioner intended to use the weapon in order to convict him of criminal possession of the weapon in the second degree. The supplemental charge merely explained to the jury that the intent to use the weapon and the manifestation of such intent did not have to occur on the same date. Accordingly, the Appellate Division's determination that petitioner's claim challenging the supplemental jury charge on intent was without merit is not contrary to, and does not involve an

unreasonable application of, federal law. As such, habeas relief is not warranted on petitioner's claim challenging the supplemental jury instruction.

### 6.    Ineffective Assistance of Trial Counsel

In order to prevail on a Sixth Amendment ineffective assistance of trial counsel claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and that "there is reasonable probability[10] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-694, 104 S.Ct. 2052, 80 L.Ed.2d (1984).

Petitioner claims that his trial counsel was ineffective for failing to request a Franks-Alfinito hearing, see Franks v. Delaware, 438 U.S. 154, 171 – 172, 98 S. Ct. 2674, 57 L.Ed.2d 667 (1978); People v. Alfinito, 16 N.Y.2d 181, 186, 264 N.Y.2d 243, 211 N.E.2d 644 (N.Y. 1965), to challenge the veracity of a search warrant's affiant.

To obtain a Franks-Alfinito hearing, a defendant must make a "substantial preliminary showing" that the affiant made a false statement in the warrant affidavit either knowingly, or with reckless disregard for the truth, and that the false statement was necessary to the finding of probable cause. Franks, 438 U.S. at 155-156, 98 S.Ct. 2674; see also Armstrong v. Duncan, Nos. 03 Civ. 930, 03 Civ. 1442, 2003 WL 22339490 at * 7 (S.D.N.Y. Oct. 14, 2003). Since there is no support, no less "substantial support," for petitioner's allegation that Herzlinger made false

---

[10] A "reasonable probability" is a probability "sufficient to undermine the confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d (1984).

statements in his warrant application, his trial counsel was not ineffective for failing to request a Franks-Alfinito hearing. See, e.g., Armstrong, 2003 WL 22339490 at * 7.

Petitioner's counsel chose to attack the issuance of the search warrant by employing a different strategy, i.e. attempting to impeach the credibility of the confidential informant. As there are numerous ways to provide effective assistance in any given case, simple disagreements over trial strategies and tactics are insufficient to establish ineffectiveness. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052; see also Henry v. Poole, 409 F.3d 48, 61 (2d Cir. 2005); Gluzman v. United States, 124 F.Supp.2d 171, 174 (S.D.N.Y. 2000) ("Among the 'virtually unchallengeable' tactical decisions left to the judgment of trial counsel are determinations regarding the defense strategy adopted at trial").

To prove a claim of ineffective assistance of counsel, a petitioner must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Petitioner's trial counsel presented a reasonable defense, interposed appropriate objections, effectively cross-examined witnesses, delivered cogent opening and closing statements and was successful in obtaining a "not guilty" verdict on one of the charges against petitioner. Accordingly, the representation petitioner's trial counsel provided fell within the wide range of reasonable professional assistance. Thus, the Appellate Division's determination that petitioner's ineffective assistance of trial counsel claim was without merit is not contrary to, and does not involve an unreasonable application of, federal law. As such, habeas relief is not warranted on petitioner's ineffective assistance of trial counsel claim.

7.    Consecutive Sentence Claim[11]

Petitioner claims that the sentences for the convictions of two (2) counts of criminal

possession of a weapon in the second degree and one (1) count of criminal possession of a

controlled substance in the third degree should be made to run concurrently because his

possession of weapons "constitute [sic] a 'single act' in that [the possession of the weapons with

intent to use] was a material element of the [possession of the narcotics with intent to sell]."

Petitioner's claim is without merit. New York law authorizes consecutive sentences

where the criminal acts constitute separate offenses, but prohibits consecutive sentences based on

the same criminal act. N.Y. Penal Law § 70.25. Specifically, N.Y. Penal Law § 70.25(2)

provides, in pertinent part:

> When more than one sentence of imprisonment is imposed on a person for two or
> more offenses committed through a single act or omission, or through an act or
> omission which in itself constituted one of the offenses and also was a material
> element of the other, the sentences, * * *, must run concurrently.

Thus, New York law prohibits consecutive sentences "'(1) where a single act constitutes

two offenses, or (2) where a single act constitutes one of the offenses and a material element of

the other.'" People v. Taveras, 12 N.Y.3d 21, 25, 878 N.Y.S.2d 642, 906 N.E.2d 370 (2009)

(quoting People v. Laureano, 87 N.Y.2d 640, 643, 642 N.Y.S.2d 150, 664 N.E.2d 1212 (1996)).

Under New York law, "[e]ven if the material elements overlap, consecutive sentences are

permissible where the People demonstrate that the offenses are based on separate and distinct

acts." Palacios v. Burge, 470 F.Supp.2d 215, 224 (E.D.N.Y. 2007) (quoting People v. Parks, 95

---

[11] Petitioner does not contend that his sentence was excessive or that it constitutes cruel
and unusual punishment in violation of the Eighth Amendment.

N.Y.2d 811, 815 n. 2, 712 N.Y.S.2d 429, 734 N.E.2d 741 (2000)). The Double Jeopardy Clause only bars consecutive sentences that are imposed in violation of state law. See <u>Missouri v. Hunter</u>, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983) (holding that the Double Jeopardy Clause is violated only if the sentence imposed a "greater punishment than the legislature intended").

As noted above, the elements of criminal possession of a weapon in the second degree under New York law are: possession of a loaded firearm "with intent to use the same unlawfully against another." N.Y. Penal Law § 265.03(1)(b). The elements of criminal possession of a controlled substance in the third degree are: knowingly possessing a narcotic drug "with intent to sell it. . . ." N.Y. Penal Law §220.16(1). The possession of a controlled substance count and the weapon possession counts constitute separate and distinct crimes, as the possession of one is not a material element of the other.

Since the state court's imposition of consecutive sentences does not violate New York Penal Law § 70.25 or the Double Jeopardy Clause, the Appellate Division's finding that this claim was without merit is not contrary to, and does not involve an unreasonable application of, federal law. Accordingly, habeas relief is not warranted on petitioner's claim that his sentences should be made to run concurrently.


III.    CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; <u>see also</u>

Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See, 28 U.S.C. § 2253.

The Clerk of the Court is directed to serve notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of this Order to the *pro se* petitioner, and to close this case.

SO ORDERED

SANDRA J. FEUERSTEIN
United States District Judge

Dated: August 20, 2009
       Central Islip, New York